50 F.3d 14
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Fera Goldwasser-De DORON, Petitioner,
v.
IMMIGRATION & NATURALIZATION SERVICE, Respondent.
 No. 93-70669.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Feb. 15, 1995.
Decided March 3, 1995.
 
 Before: FLETCHER, PREGERSON, and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Petitioner Fera Goldwasser-De Doron (Doron) appeals the Board of Immigration Appeals' (BIA or the Board) decision denying her suspension of deportation under Sec. 244(a) of the Immigration and Nationality Act (INA), 8 U.S.C. Sec. 1254(a), for lack of extreme hardship. We have jurisdiction over the final deportation order under Sec. 106 of the INA, 8 U.S.C. Sec. 1105(a). We affirm.
 
 I. BACKGROUND
 
 3
 Fera Goldwasser-De Doron was born in Russia in 1924. When she was one month old, she moved with her family to China. Doron attended English-speaking schools in China, and considers English to be her dominant language.[1]
 
 
 4
 Fera Doron married her husband, Ben Doron, in Shanghai in 1944. When China began to fall to the Communists, Doron and her husband and child traveled to San Francisco with Soviet passports. After two months in San Francisco, the couple moved to Mexico City. In Mexico City, Ben Doron set up a business importing goods from China. Fera Doron and her husband became Mexican citizens in 1951. They lived in Mexico City for about nine years.
 
 
 5
 The Dorons then moved to Tijuana because the altitude in Mexico City was bad for Ben Doron's health. Fera Doron testified that she was also unhealthy in Mexico City. (AR at 74.) Ben Doron continued to run his import business from Tijuana. While living in Tijuana, Fera Doron developed arthritis. According to Doron, her arthritis was so bad in Tijuana that she could not walk properly and had to be helped out of bed. (AR at 75.) Doron says she had to go to the hospital "at least once every two months" while living in Tijuana. (Id.) She also had difficulty breathing because of allergies.
 
 
 6
 Beginning in about 1972, Doron started making extended trips to Las Vegas. Doron found that in Las Vegas her arthritis pain went away, and she could breathe more easily. In 1982, Doron decided to live full-time in Las Vegas. The last visa entered on her passport was a December 1986 non-immigrant visa, which expired in June 1987.
 
 
 7
 Since 1982, Doron has lived on her own in an apartment in Las Vegas. She does not have any family in the United States. Her husband and her two sons (one of whom is a medical doctor) still live in Tijuana. Doron's primary activity in Las Vegas is playing bingo every day. Doron has never worked while living in the United States. She lives on the $1,200 her husband sends her each month. Doron also has approximately $20,000 in three bank accounts. (AR at 81.)
 
 
 8
 Doron testified to the immigration judge that while living in Tijuana, she had to take a great deal of medication to feel comfortable, but said that she feels healthy with a minimum of medication in Las Vegas. Doron does not have a doctor in the United States; she receives treatment from her son when he comes to visit her. (AR at 91.)
 
 
 9
 In about 1992, Doron turned herself in to the INS and applied for suspension of deportation. Doron testified that she did this voluntarily because she feels that she belongs in the United States, and she wants "to feel I am a part of this place." (AR at 89.)
 
 
 10
 At her deportation hearing, Doron conceded her deportability, but sought suspension of deportation because of extreme hardship under section 244(a) of the INS, 8 U.S.C. Sec. 1254(a). Doron argued that deportation would cause her extreme hardship because she is unhealthy when she lives in Tijuana, but she can live comfortably in Las Vegas. In support of this, Doron submitted letters from three doctors (including a letter from her son), which stated that she suffers from arthritis, and that residing in a dry climate alleviates her arthritis pain. Doron also emphasized to the immigration judge that she has strong emotional ties to Las Vegas and her life there, and that she feels American, not Mexican.
 
 
 11
 The immigration judge concluded that Doron had not established "extreme hardship," and she was therefore statutorily ineligible for suspension of deportation. In reaching this conclusion, the immigration judge stated that although he found Doron's testimony credible, the only hardship he could find was an emotional one. The immigration judge also stated that although Doron's medical condition seemed to be more severe in the humidity of Tijuana, Doron did not meet her burden of demonstrating why she could not live in one of the desert areas of Mexico. (AR at 43.)
 
 
 12
 The immigration judge went on to suggest that "if [Doron] seeks a higher desert environment and still having access to the United States and its English speaking culture, [Doron] could relocate to a place such as Juarez, Mexico which is immediately adjacent to El Paso, Texas." (AR at 43-44.) The court noted further that the El Paso yellow pages list "no fewer than five bingo parlors," which would give her the chance to keep up with her primary pastime.
 
 
 13
 Doron appealed the immigration judge's decision to the BIA. Doron argued that by mentioning the dry climate in Mexicali and Juarez, as well as the number of bingo parlors listed in the El Paso yellow pages, the immigration judge improperly considered evidence outside the record. In addition, Doron argued that the immigration judge did not take into account her health problems and her age when reviewing her claim. (AR 17-20.)
 
 
 14
 The BIA ruled that the immigration judge properly denied Doron's application for suspension of deportation. The BIA reviewed her claims of advanced age, emotional ties to Las Vegas, and health problems, and concluded that
 
 
 15
 while [Doron's] health may very well be enhanced by the climate in Las Vegas, she has not clearly established that, if returned to Mexico, she could not find a comparable environment or would not be able to maintain her current good health, especially as she has her usual doctors and her son, a doctor, at her disposal.
 
 
 16
 (AR at 3.) The BIA also ruled that it was not improper for the immigration judge to take notice of facts not offered as evidence because he did so only in the context of evaluating her claim that she was confined to Las Vegas because of her health. (AR at 4.) The BIA stated further that even if the immigration judge did err in considering this evidence, Doron had not shown that the result of the hearing would have been different in the absence of this error. (Id.)
 
 II. ANALYSIS
 
 17
 Doron now appeals the BIA's denial of her suspension of deportation.
 
 A. Statutory Framework
 
 18
 Doron seeks a suspension of deportation under section 244(a) of the INA, 8 U.S.C. Sec. 1254(a). Under section 244, to qualify for a suspension of deportation, an alien must show (1) continuous physical presence in the United States for a period of at least seven years immediately preceding the date of application, (2) good moral character, and (3) "extreme hardship" to himself or herself, or to a spouse, parent or child who is a citizen or a permanent resident of the United States. 8 U.S.C. Sec. 1254(a)(1).
 
 
 19
 The immigration judge found that Doron met the first two requirements for suspension of deportation. The only issue in all of these proceedings has been whether Doron has established that her deportation would cause her extreme hardship.
 
 B. Standard of Review
 
 20
 We review for an abuse of discretion a decision by the BIA to deny an application for the suspension of deportation for lack of "extreme hardship." Hassan v. INS, 927 F.2d 465, 467 (9th Cir.1991).
 
 
 21
 The BIA has the authority to "construe 'extreme hardship' narrowly." INS v. Wang, 450 U.S. 139, 145 (1981). But "this court has required the Board to 'state its reasons and show proper consideration of all factors when weighing equities and denying relief.' " Hassan v. INS, 927 F.2d at 467 (quoting Mattis v. INS, 774 F.2d 965, 968 (9th Cir.1985)). Failure to consider all pertinent facts supporting extreme hardship, or failure to articulate the reasons for denying suspension of deportation, is an abuse of discretion. Bu Roe v. INS, 771 F.2d 1328, 1333 (9th Cir.1985). "Because hardship depends on specific circumstances, discretion can be properly exercised only if the circumstances are actually considered." Santana-Figueroa v. INS, 644 F.2d 1354, 1357 (9th Cir.1981) (citation omitted).
 
 C. Discussion
 
 22
 Doron argues that the BIA abused its discretion because it gave inadequate consideration and distorted her argument as to four factors which would support a finding of extreme hardship. These four factors are health, age, language, and ties to the Las Vegas community.
 
 1. Doron's Health
 
 23
 The primary factor relied upon by Doron in making her extreme hardship argument was her medical claim. In support of this claim, Doron submitted letters from doctors stating that her arthritis symptoms abate when she resides in a dry climate. (AR at 144, 147, and 150.) Doron also stated in her testimony that she "couldn't get out of bed" because of pain when she lived in a humid climate, and that she could not walk properly there because of her arthritis. (AR at 75.) But Doron was evasive when questioned about living in desert areas of Mexico. (See AR at 76).
 
 
 24
 The BIA found that while the climate in Las Vegas is helpful to her arthritis symptoms, Doron did not clearly establish that she could not find a comparable dry climate in Mexico. The BIA also noted that Doron has the "financial means and family support to obtain immediate and quality medical attention should her health worsen upon her return to Mexico." (AR at 3.)
 
 
 25
 In Prapavat v. INS, 662 F.2d 561, 562 (9th Cir.1981), we reversed the BIA's denial of an application for suspension of deportation where the BIA gave only "cursory reference" to the aliens' citizen child's "inconvenience," instead of making explicit what weight the Board gave to the evidence that the medical problems of the Prapavats' daughter could worsen in the Thai climate. Further, the Board in that case did not even state whether it had considered the medical evidence at all. Id. Here, in contrast, the Board in its opinion explained specifically why it did not find Doron's medical complaints sufficient to establish extreme hardship.
 
 
 26
 Contrary to Doron's assertion, the BIA did consider her claim that leaving Las Vegas would be harmful to her health. The BIA did not abuse its discretion in finding that her medical condition "is not a factor that is so grave or unique that sending [Doron] back to Mexico would mean denying her all possibility of good health." (AR at 4.)
 
 2. Doron's Age
 
 27
 The BIA stated in its opinion that it was "sympathetic" to Doron's age and emotional ties to Las Vegas, and found those factors to be "relevant," but "not of such a character that deportation would impose an extreme hardship." (AR at 4.) The Board stated further that "nothing in this record suggests that [Doron] is incapable of making that move to Mexico due to her age or that once back in Mexico, her age would prevent her from leading a productive life." (Id.) The Board summarized its conclusions about Doron's health by noting that these concerns were "significant especially in light of [her] age." (Id.) Finally, the Board also stated Doron appears to be "energetic" and "independent" and not "an individual who would be hampered by age." (Id.)
 
 
 28
 Given the BIA's repeated mention of Doron's age in its opinion, the Board clearly gave close consideration to this factor. The BIA did not abuse its discretion by failing to adequately consider this factor.
 
 3. Language
 
 29
 Doron argues that the BIA failed to consider the "issue of language," although she says she raised this issue in her appeal of the immigration judge's decision.
 
 
 30
 However Doron did not make any argument about language in her brief to the BIA. The only mention of language in her brief is a single sentence which reads: "He [the immigration judge] states that language alone would not be a reason to establish extreme hardship." (ER at 17.)
 
 
 31
 In her brief to this court, Doron states that "language is an important relevant factor," but she never explains what her language argument is. (Blue br. at 9.) The most obvious argument to infer from this is that Doron does not speak Spanish, or that she at least prefers to speak English, and thus returning her to a country where Spanish is spoken would impose an extreme hardship upon her.
 
 
 32
 Doron asserts that the immigration judge had no basis for his conclusion that she speaks Spanish. But this conclusion does not seem to be too great a leap: Doron told the immigration judge that she speaks seven languages (AR at 69), she lived in Mexico from 1947 until the early 1980s, and she made reference to speaking Spanish when describing translation work she did for the court (AR at 87).
 
 
 33
 The BIA did not abuse its discretion in failing to consider incapacity to speak Spanish as a hardship factor because of the immigration judge's conclusion that she spoke Spanish.
 
 4. Ties to the Community
 
 34
 Finally, Doron contends that the BIA erred in giving only a cursory review to the strong emotional ties Doron has to the Las Vegas community and to her friends there. In support of this argument, Doron cites Santana-Figueroa v. INS, 644 F.2d 1354 (9th Cir.1981).
 
 
 35
 In Santana-Figueroa, we ruled that the Board should have considered the fact that the petitioner regularly attended church in his American community for ten years, had close friends in his American community, and felt that he had become part of American society. In that case, Santana-Figueroa had also enclosed a letter from his priest who wrote that the petitioner had been "an asset to the church and to the community." Santana-Figueroa, 644 F.2d at 1357. It is important to note, however, that in Santana-Figueroa, we were primarily concerned with the Board's lack of consideration of the fact that this 70-year-old disabled man would be completely unable to work if deported to Mexico. Id. at 1356. In that case, we reversed the BIA's denial of Santana-Figueroa's claim, stating that the Board should have considered his economic hardship alongside the noneconomic hardship of leaving his close community ties. Id. at 1357.
 
 
 36
 In this case, the BIA did give consideration to Doron's "emotional ties" argument. (See AR at 4, first full paragraph.) The BIA did not abuse its discretion because it adequately considered this factor.
 
 5. Consideration of Claims in the Aggregate
 
 37
 This circuit has held that "the adverse consequences of deportation are to be considered cumulatively in determining whether 'extreme hardship' exists," and that the Board must not weigh each relevant factor in isolation. Prapavat, 662 F.2d at 562 (emphasis in original). But the BIA stated in its opinion that "the factors which have been set forth do not, individually or in the aggregate, convince us that respondent warrants the extraordinary relief authorized in section 244(a) of the Act." (AR at 4 (emphasis added).) This sentence, plus the tone of the opinion as a whole, convince us that the Board did consider in the aggregate the various arguments raised by Doron.
 
 III. CONCLUSION
 
 38
 The decision of the BIA is AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Doron has indicated, however, that she speaks seven languages. (ER at 69.)